UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

JOHN GAD ALLA,

                                  Plaintiff,

        -v-

THE CITY OF NEW YORK, New York City Police
Department Officer ("P.O.") BRIAN VERKAY (Shield
No. 2055), P.O. TANISHA DORSON (Shield No. 03481),
LIEUTENANT JOHN GANLEY, SERGEANT ("SGT.")
DOMAGOJ ANTICEV (Shield No. 14), P.O. ANSARI
KALIL (Shield No. 11189), SERGEANT PATRICK
HEALY, P.O. JOHN DOE 1 through P.O. JOHN DOE 5
(the name John Doe being fictitious, as their true names
and shield numbers are presently unknown), in their
individual and official capacities,

                                  Defendants.

------------------------------------------------------------------------x

**SECOND AMENDED
COMPLAINT AND DEMAND
FOR A JURY TRIAL**

**11-CV-0892 (FB) (RLM)**

## PRELIMINARY STATEMENT

1.  This is a civil rights action brought to vindicate plaintiff's rights under the Fourth and
Fourteenth Amendments of the Constitution of the United States, through the Civil Rights
Act of 1871, <u>as amended</u>, codified as 42 U.S.C. § 1983, and pendant claims through the
Constitution and laws of the State of New York.

2.  Plaintiff JOHN GAD ALLA's rights were violated when officers of the New York City
Police Department ("NYPD") unconstitutionally and without any legal basis arrested and
used gratuitous, unlawful force against the plaintiff, despite knowing there was no
justification for an arrest or use of force.  By reason of defendants' actions, particularly their

unreasonable use of force and unlawful arrest, plaintiff was deprived of his constitutional rights.

3.  Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

5.  Pursuant to New York State General Obligations Law § 50-G, the plaintiff filed a timely Notice of Claim with the New York City Comptroller on or about September 16, 2010, within ninety (90) days of the events herein complained of. Thus, this Court has supplemental jurisdiction over plaintiff's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.  Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

7.  Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiff's claim arose in the Eastern District of New York.

8.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

9.  Plaintiff JOHN GAD ALLA is, and was at all times relevant to this action, a resident of the State of New York and the County of Kings.

10. Plaintiff is an Egyptian-American and an American citizen.

11. Defendant, THE CITY OF NEW YORK ("CITY"), is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force, as well as the employment of police officers, as said risks attach to the public consumers of the services provided by NYPD.

12. New York City Police Department Officer ("P.O.") BRIAN VERKAY (Shield No. 2055), P.O. TANISHA DORSON (Shield No. 03481), LIEUTENANT ("LT.") JOHN GANLEY, SERGEANT ("SGT.") DOMAGOJ ANTICEV (Shield No. 14), P.O. ANSARI KALIL (Shield No. 11189), SGT. PATRICK HEALY, P.O. JOHN DOE 1 through P.O. JOHN DOE 5 (referred to collectively as the "individual defendants") were at all times relevant herein, officers, employees and agents of the NYPD.

13. Defendants P.O. VERKAY, P.O. DORSON, LT. GANLEY, SGT. ANTICEV, and P.O. KALIL, are currently officers, employees and/or agents of the NYPD.

14. Upon information and belief, defendant SGT. HEALY has retired and is no longer an employee of the NYPD.

15. The individual defendants are being sued herein in their individual and official capacities.

16. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers,

agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

17. The true names and shield numbers of defendants P.O. JOHN DOE 1 through P.O. JOHN DOE 5 [1] are not currently known to the plaintiff. However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to N.Y. G.O.L. § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiff intends to name said officers as defendants in an amended pleading once the true names and shield numbers of said defendants becomes known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

18. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for plaintiff's rights.

19. At all relevant times, defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

20. The events described herein begin in the vicinity of 27 Avenue V in the County of Kings shortly before midnight on September 10, 2010.

21. At all times relevant herein, plaintiff resided in an apartment within 27 Avenue V which he shared with other men.

22. Inside plaintiff's apartment, at approximately the time mentioned supra, two (2) men who lived inside the apartment building began physically fighting with each other. Eventually, the

---

[1]    By identifying these officers as "John Doe," plaintiff is making no representation as to their gender.

fight between the two (2) men spilled from the common area of the apartment into plaintiff's bedroom.

23. Inside the bedroom, one (1) of the men (herein, "the perpetrator") hit the other man on the head, causing him to begin bleeding from his scalp. In response, the man who was bleeding ("bleeding man") ran out of plaintiff's bedroom, out of plaintiff's apartment, and downstairs towards the exit of the building.

24. Because plaintiff knew bleeding man and since plaintiff was concerned about bleeding man's well-being, plaintiff ran after him to see if he needed medical attention.

25. When plaintiff caught up with bleeding man, plaintiff asked if he needed medical attention, but bleeding man refused.

26. Since bleeding man said he did not need medical attention, plaintiff went back upstairs into his apartment.

27. When he got back to his apartment, plaintiff telephoned one (1) of his neighbors at work to tell him about the fight.

28. Upon information and belief, in the interim, the bleeding man called the police regarding the incident, resulting in police officers arriving to the apartment building.

29. Upon information and belief, when the police arrived outside the apartment building, they saw bleeding man standing outside.

30. Upon information and belief, the police asked bleeding man who he was fighting with.

31. Upon information and belief, in response, bleeding man told the police, in sum and substance the perpetrator was upstairs and described the perpetrator as an Egyptian who was wearing a white shirt and carrying a knife.

32. At all time relevant herein, plaintiff was wearing a light, cream-colored white shirt.

5

33. About fifteen (15) to twenty (20) minutes later, plaintiff could hear the police, to wit, the individual defendants, yelling outside of plaintiff's door, in sum and substance, "POLICE! OPEN THE DOOR!"

34. In response to the commotion, plaintiff approached his bedroom door and cracked it open.

35. As soon as the door was cracked open, approximately ten (10) uniformed police officers, to wit, the individual defendants, rushed into plaintiff's bedroom towards plaintiff and began screaming at plaintiff to put his hands in the air.

36. In so doing, at least three (3) of the individual defendants had their guns drawn and pointed at plaintiff, with at least one (1) of said guns being about three (3) feet in front of plaintiff's face.

37. In response, plaintiff immediately put his hands in the air and was saying, in sum and substance, "Its alright, its O.K."

38. Approximately four (4) or five (5) of the officers continued rushing and pushing plaintiff backwards, eventually pushing plaintiff over a coffee table, causing plaintiff to fall on a bed. As a result, the coffee table broke into three (3) pieces and spilled a large jar of pickles on the carpet.

39. While plaintiff was laying on his side, the officers then immediately rear-cuffed the plaintiff on the bed.

40. Plaintiff was terrified at the officers' conduct, so he complied with their demands to remain laying on his side.

41. Then, without warning or provocation, defendant P.O. VERKAY ran into the room, stepped onto the bed with one (1) foot, and punched plaintiff hard in the vicinity of his right temple, causing plaintiff extreme pain and wooziness.

42. The other officers who arrested and handcuffed plaintiff were in close proximity to plaintiff and defendant P.O. VERKAY when this happened, and they were in a position to prevent defendant P.O. VERKAY from using said force upon plaintiff. However, these officers chose not to intervene to prevent this unnecessary use of force.

43. In fact, in response to defendant P.O. VERKAY's use of force, approximately two (2) or three (3) of the other officers lifted plaintiff off the bed and threw him chest-first into the refrigerator, causing injury and pain to plaintiff's rib or ribs.

44. The officers, including but not limited to defendant P.O. VERKAY, then pushed plaintiff's face into the refrigerator, causing further pain to the right side of his face which defendant P.O. VERKAY had earlier punched.

45. In response to the ongoing beating, plaintiff was terrified and stated, in sum and substance, "Do whatever you want, but don't hurt me."

46. Shortly thereafter, bleeding man entered the apartment.

47. The officers asked bleeding man if plaintiff was the perpetrator.

48. Bleeding man looked at plaintiff, realized the police had apprehended the wrong man with a white t-shirt, and told the officers that plaintiff was not the perpetrator.

49. As a result, the officers uncuffed the plaintiff.

50. Plaintiff then immediately went into the kitchen to run cold water over his head in order to relieve pain and alleviate dizziness from the police assault.

51. Soon thereafter, plaintiff became even dizzier, and, as a result, plaintiff collapsed or fell into defendant P.O. VERKAY.

52. Plaintiff then looked at defendant P.O. VERKAY and asked said defendant if he could sit down in a chair, and defendant P.O. VERKAY responded he could do so.

7

53. After plaintiff had sat down and while he was still confused and in tremendous pain, plaintiff repeatedly asked the officers, in sum and substance, "[h]ow could you do this to me?"

54. While this was happening, some of the police officers rushed into an upstairs bedroom, with guns drawn, apparently searching for the person who had been fighting with bleeding man.

55. Upon seeing this, plaintiff tried to explain to the officers, in sum and substance, "Nobody's here, they're at work."

56. Soon thereafter, defendant P.O. VERKAY told plaintiff, in sum and substance, as follows: "YOU HAVE TO LISTEN TO ME.  PUT YOURSELF IN MY SHOES.  I WAS TOLD THERE WAS AN EGYPTIAN GUY WITH A KNIFE AND WHITE T-SHIRT.  ONCE I SAW YOU, I DIDN'T THINK.  I THOUGHT YOU WERE WRESTLING WITH THE OTHER OFFICERS."

57. Defendant P.O. VERKAY then apologized to plaintiff over and over again.

58. While this was happening, other officers began mocking plaintiff and making fun of his injuries.

59. Upon seeing two (2) female officers laughing at him, plaintiff said, in sum and substance, "It's not funny."

60. While approximately two (2) officers remained with plaintiff in the apartment, the other officers went downstairs to wait for an ambulance for bleeding man. These two (2) officers tried to convince plaintiff he was in the wrong for the above-described incident.

61. Soon thereafter, defendant P.O. VERKAY approached plaintiff with a bag of ice and told plaintiff, in sum and substance, "HERE, THIS SHOULD MAKE YOU FEEL BETTER."

62. At this time, plaintiff had the impression defendant P.O. VERKAY was indeed sincere and apologetic at the incident.

63. Shortly thereafter, defendant P.O. VERKAY began asking plaintiff for his pedigree information and about information regarding the perpetrator.

64. Plaintiff cooperated with all of defendant P.O. VERKAY's questioning.

65. As that questioning was coming to an end, plaintiff began to worry this incident might affect his pending security clearance to work in Iraq as a contract translator with Global Linguist Solutions ("GLS"), a contractor with the United States Army.

66. Plaintiff explained the situation with his pending security clearance to defendant P.O. VERKAY. In response, defendant P.O. VERKAY told plaintiff, in sum and substance, that his report would not affect plaintiff's security clearance.

67. Distraught and worried about the impact of these events, plaintiff telephoned a friend of his in California for advice. In response, plaintiff's friend told plaintiff to call an ambulance for himself.

68. Plaintiff followed his friend's advice and called for an ambulance. However, when the ambulance arrived, plaintiff refused medical treatment at that time because he did not have health insurance. Accordingly, the ambulance left without treating plaintiff's injuries.

69. At this time, plaintiff sat on a curb while a friend of his tried to convince him to seek medical attention for his injuries.

70. Some time thereafter, defendants P.O. VERKAY, P.O. DORSON, and SGT. HEALY approached plaintiff.

71. When plaintiff saw defendants P.O. VERKAY and P.O. DORSON approaching, plaintiff walked up to them and asked, in sum and substance, "I'm in a lot of pain, who is going to help me now?"

72. Defendant P.O. VERKAY then told plaintiff, in sum and substance, as follows: "I'M SORRY, I HAVE BAD NEWS FOR YOU. I WISH I DIDN'T HAVE TO TELL YOU THIS.  ITS NOT MY FAULT.  I JUST FOLLOW THE RULES.  WHEN I SHOWED MY SUPERVISORTHIS PAPER [with plaintiff's names on it], HE TOLD ME I HAVE TO PUT YOU UNDER ARREST." [2]

73. Plaintiff was shocked when he heard this, and he asked defendant P.O. VERKAY, in sum and substance, why he was being re-arrested.

74. In response to plaintiff's question, defendant P.O. VERKAY told plaintiff, in sum and substance, "I'M SORRY, I'M ONLY WEARING A BLUE SHIRT.  I HAVE TO OBEY [defendant LT. GANLEY's and/or SGT. HEALY's] ORDERS."

75. Defendant P.O. VERKAY then continued apologizing to plaintiff.

76. Defendant P.O. VERKAY gently rear-cuffed plaintiff, frisked him, and found plaintiff's cell phone and wallet on plaintiff's person.

77. Defendant P.O. VERKAY told plaintiff he should leave his wallet and cell phone in his apartment. Accordingly, the officers removed plaintiff's handcuffs and escorted plaintiff upstairs to his apartment. Once there, plaintiff put his wallet and cell phone inside his apartment and closed the door behind him.

78. Once plaintiff and the two (2) officers left the apartment, the officers again rear-cuffed the plaintiff and took him downstairs and outside.

79. Once plaintiff was outside, defendant P.O. VERKAY took plaintiff over towards either defendant LT. GANLEY or defendant SGT. HEALY and told his supervisor, in sum and substance, "THIS IS THE GUY WHO WAS RESISTING."

---

[2]     Upon information and belief, defendant LT. GANLEY ordered defendant P.O. VERKAY to arrest plaintiff after P.O. VERKAY told LT. GANLEY what happened inside the apartment and after showing LT. GANLEY a copy of an Aided Report and a Stop Question Frisk form with plaintiff's name on it.

80. In response, defendant LT. GANLEY nodded in approval and said, in sum and substance, "O.K."

81. Defendant P.O. VERKAY then put plaintiff in the back of a police vehicle. Defendant P.O. VERKAY got into the driver's seat of the vehicle and drove away.

82. En route to the precinct, defendant P.O. VERKAY told plaintiff, in sum and substance, as follows: "I'M GONNA DO MY BEST TO BE WITH YOU THROUGH THIS. I'M NOT GONNA LEAVE YOU ALONE. I TALKED TO [defendant LT. GANLEY], AND I ASKED HIM TO PUT YOU IN A SINGLE CELL DOWNSTAIRS."

83. Defendant P.O. VERKAY continued talking to plaintiff, stating, in sum and substance, as follows: "IF YOU WANNA GO TO THE HOSPITAL, I WILL TRY TO TAKE YOU MYSELF. I HAVE A DAY OFF TOMORROW, BUT I'M NOT GONNA GO HOME UNTIL I BRING YOU TO COURT MYSELF.  I'LL DO MY BEST."

84. Defendant P.O. VERKAY also told plaintiff, in sum and substance, "IF YOU WANT TO GO TO THE HOSPITAL, WE WILL HAVE TO PUT CUFFS ON YOUR HANDS AND LEGS."

85. After a few minutes inside the precinct, defendant P.O. VERKAY told plaintiff that defendant LT. GANLEY would not permit plaintiff to be placed in a single cell downstairs. This caused plaintiff to become terrified, and, since he had never before been under arrest or in jail, plaintiff feared for his physical well-being inside the precinct.

86. Then, defendant P.O. VERKAY walked plaintiff towards a cell containing several inmates.

87. Looking into the cell, plaintiff immediately noticed the perpetrator inside. The perpetrator also noticed plaintiff and immediately began yelling towards defendant P.O. VERKAY, in sum and substance, "He's innocent! He didn't do anything!"

88. In response, defendant P.O. VERKAY told the perpetrator, in sum and substance, "I KNOW, BUT THERE'S NOTHING I CAN DO."

89. Plaintiff was then placed inside the cell with other inmates.

90. While plaintiff was in the cell, defendant P.O. VERKAY occasionally came by the cell to check on plaintiff's well-being.

91. At some point, plaintiff was removed from the cell so that officers could take fingerprints from and photographs of the plaintiff. After that was completed, plaintiff was placed back into the cell.

92. Soon thereafter, the pain in plaintiff's ribs and jaw became overwhelming, causing him to request medical attention and refuse water since his jaw was in too much pain to drink.

93. Defendant P.O. VERKAY told plaintiff, in sum and substance, that an ambulance was going to come but that such medical treatment might delay his release.

94. As a result of defendant P.O. VERKAY's warning, plaintiff refused an ambulance before it arrived.

95. Soon thereafter, medics within the precinct examined plaintiff's injuries.

96. At some point, the perpetrator's brother brought food to the precinct and spoke to defendant P.O. VERKAY. Defendant P.O. VERKAY then brought the food to the cell for the perpetrator and plaintiff to share.

97. However, plaintiff could not eat this because his jaw was in too much pain.

98. Later, defendant P.O. VERKAY told plaintiff, in sum and substance, "I'M GONNA TRY TO RELEASE YOU IN THE MORNING SO YOU DON'T HAVE TO GO TO COURT, BUT I CAN'T PROMISE."

99. Around 6:00 A.M., defendant P.O. VERKAY then went into his locker room within the precinct and changed his clothes since, upon information and belief, his work shift had ended.

100.    When defendant P.O. VERKAY emerged from his locker room, he was wearing a white t-shirt which read "I LOVE MANGOES" or "I ♥ MANGOES."

101.    Defendant P.O. VERKAY then told plaintiff, in sum and substance, that he was going to stay at the precinct with plaintiff until plaintiff was released and that he was going to take a nap in the interim.

102.    Defendant P.O. VERKAY also continued apologizing to the plaintiff.

103.    Around 8:00 A.M., defendant P.O. VERKAY again approached plaintiff and told him, in sum and substance, "I HAVE TO MAKE A COUPLE PHONE CALLS BUT I'M GONNA GET YOU RELEASED."

104.    Later, defendant P.O. VERKAY re-approached plaintiff and told him, in sum and substance, as follows: "I'VE BEEN CALLING DOWNTOWN BUT THE LINE WAS BUSY… DON'T THINK I FORGOT ABOUT YOU."

105.    Around 10:30 A.M. or 11:00 A.M., defendant P.O. VERKAY said to plaintiff, "JOHN, YOU CAN COME OUT NOW."

106.    Defendant P.O. VERKAY then told plaintiff, in sum and substance, that he was being released without charges and that he could go home.

107.    After a short discussion with defendant P.O. VERKAY about what plaintiff should tell his prospective employer regarding the incident and plaintiff's pending security clearance, plaintiff left the precinct.

108.    Accordingly, plaintiff was wrongfully in defendants' custody for approximately eleven (11) hours.

109.    A few hours after he was released, plaintiff sought treatment for his injuries at Coney Island Hospital.

110.    Due to lingering pain and discomfort to plaintiff's ribs, jaw, and head, plaintiff sought follow-up treatment with other medical providers.

111.    Several days after the incident, on September 17, 2010, plaintiff's ribs began causing him excruciating pain, causing him to call an ambulance which took him to Coney Island Hospital for evaluation. Doctors were concerned that plaintiff had an injury to his spleen, so, in order to rule out that injury, the medical staff administered a CAT scan and a blood test, and also gave plaintiff a shot to relieve his pain.

112.    After further evaluation, plaintiff was diagnosed with, inter alia, one (1) complete fracture and two (2) partial fractures in the right part of his skull (namely, the right zygomatic arch), where he had been punched by defendant P.O. VERKAY. Those fractures cannot be repaired with surgery without re-fracturing the bones, which his doctor initially recommended against.

113.    As a result of the incident, plaintiff was unable to obtain a security clearance to work for GLS in Iraq, resulting substantial loss of income.[3]

114.    But for the incident, plaintiff's application for the security clearance would have been granted.

115.    As a further result of the denial of plaintiff's application for a security clearance, plaintiff is not eligible for any other translator or linguist contractor positions working with the United

---

[3]    Had he obtained the security clearance for which he was otherwise eligible, plaintiff would have had a "Category 2" salary of approximately $150,000.00 per year, with an option to renew, to work as a translator/linguist for GLS in Iraq.

States Government in Iraq or elsewhere overseas, resulting in further loss of income and career advancement.

116.    As a result of defendants' conduct, plaintiff has experienced, and is continuing to experience, profound depression and anxiety.

117.    As a further result of defendants' conduct, plaintiff continues to experience pain and discomfort in and around the right side of his jaw and headaches caused by the fractures. He also experiences pain in the side of his torso which causes pain when plaintiff does even minor physical activity.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

118.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

119.    Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

   a.  Freedom from unreasonable seizure of his person, including the excessive use of force;

   b.  Freedom from arrest without probable cause;

   c.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

   d.  Freedom from deprivation of liberty without due process of law; and

   e.  The enjoyment of equal protection, privileges and immunities under the laws.

120.    Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

121.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

122.    By failing to remedy the wrongs committed by his subordinates, and in failing to properly train, screen, supervise, or discipline his subordinates, and by explicitly ordering and approving of plaintiff's arrest despite his subordinate officer(s) informing him that plaintiff was factually innocent of any violation of the law related to the above-described incident, defendants LT. GANLEY and SGT. HEALY caused damage and injury in violation of plaintiff's rights guaranteed under 42 U.S.C. § 1983, and the United States Constitution, including its Fourth and Fourteenth Amendments.

123.    As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## THIRD CLAIM
## FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983

124.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

126.   The individual defendants were present for the above-described incident and witnessed defendant P.O. VERKAY unlawfully arrest the plaintiff.

127.   Defendant P.O. VERKAY's use of force against plaintiff was obviously excessive and unjustified under the circumstances yet the other individual defendants failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by defendant P.O. VERKAY.

128.   The individual defendants' violations of plaintiff's constitutional rights by failing to intervene in defendant P.O. VERKAY's clearly unconstitutional use of force and plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

## FOURTH CLAIM
## *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

129.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

130.   All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY OF NEW YORK which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

131.   Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

132.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages,

practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

133.   The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a.   Using excessive force on individuals, including but not limited to those who have already been handcuffed;

   b.   Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   c.   Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

   d.   Retaliating against officers who report police misconduct; and

   e.   Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

134.   The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

   a.   Thompson v. City of New York, 10-CV-3603 (ARR) (SMG) (E.D.N.Y.) (while arrestee is handcuffed and compliant, police officers use their Asp, or expandable metal baton, to beat plaintiff and also apply Mace to his face without cause);

   b.   Lotorto v. City of New York, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

   c.   Zabala v. City of New York, 3771/2010 (Sup. Ct., Kings Co.) (police officers severely beat and TASER a compliant, prone, bloodied and semi-conscious suspect after he had surrendered);

   d.   Ashe v. City of New York, 09-CV-9696 (GBD) (THK) (S.D.N.Y.) (police officers beat and use Mace upon arrestees even though they were both already handcuffed and compliant);

   e.   Long v. City of New York, 09-CV-9216 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force);

f.  <u>Moise v. City of New York</u>, 09-CV-9855 (DC) (JLC) (S.D.N.Y.) (police officers beat and use Mace upon a compliant arrestee while he was already in handcuffs);

g.  <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

h.  <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal/Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

i.  <u>Carmody v. City of New York</u>, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

j.  <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k.  <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l.  <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m.  <u>Powers v. City of New York</u>, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n.  <u>Dotson v. City of New York</u>, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

o.  <u>Nonnemann v. City of New York</u>, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early

retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

p.  <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

q.  <u>Barry v. New York City Police Department</u>, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

r.  <u>Walton v. Safir</u>, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

s.  <u>White-Ruiz v. The City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

t.  <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

u.  <u>Sorlucco v. New York City Police Department</u>, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

v.  <u>Kaufman v. City of New York</u>, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

135.  The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[4]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner Raymond E. Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[5]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[6] When it does, however, Police Commissioner KELLY controls whether

---

[4]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[5]    Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[6]    In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated

the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[7] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[8]

136. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

137. The existence of the above-described unlawful <u>de facto</u> policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory

---

complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[7]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[8]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

138.   The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned _de facto_ policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates.   They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, _inter alia_, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

139.   All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the right:

    a.   Freedom from unreasonable seizure of his person, including the excessive use of force;

    b.   Freedom from arrest without probable cause;

    c.   Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

       d.   Freedom from deprivation of liberty without due process of law; and

       e.   The enjoyment of equal protection, privileges and immunities under the laws.

140.    Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

141.    Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

142.    Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

143.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff and arrest plaintiff without

probable cause.  Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights.

144.  Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful <u>de facto</u> policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

145.  The actions of the individual police defendants resulted from and were taken pursuant to the following <u>de facto</u> policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force against an arrestee, including but not limited to situations where said arrestee was already in handcuffs, as in the present situation.

**FIFTH CLAIM**
**RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK**
**<u>FOR STATE LAW VIOLATIONS</u>**

146.  Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

147.  The conduct of the individual defendants alleged herein, occurred while he or she was on duty and in uniform, and/or in and during the course and scope of his or her duties and functions as New York City POLICE OFFICERS, and/or while he or she was acting as an agent and employee of defendant THE CITY OF NEW YORK, clothed with and/or invoking state power and/or authority, and, as a result, defendant THE CITY OF NEW YORK is liable to plaintiff pursuant to the state common law doctrine of <u>respondeat superior</u>.

148.    As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SIXTH CLAIM
## ASSAULT AND BATTERY

149.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

150.    By the actions described above, defendants did inflict assault and battery upon plaintiff. The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

151.    As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM
## FALSE ARREST AND FALSE IMPRISONMENT

152.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

153.    By the actions described above, defendants caused to be falsely arrested or falsely arrested plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

154.    As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM
## INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

155.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

156.    By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

157.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## NINTH CLAIM
## VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW

158.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

159.    By the actions described above, defendants violated the plaintiff's right to equal protection of law.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

**TENTH CLAIM**
**NEGLIGENCE**

160.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

161.    The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

162.    As a result of the foregoing, the plaintiff was deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**ELEVENTH CLAIM**
**NEGLIGENT HIRING, SCREENING, RETENTION,**
**SUPERVISION, AND TRAINING**

163.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

164.    Defendant THE CITY OF NEW YORK negligently hired, screened, retained, supervised, and trained defendants.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

165.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

WHEREFORE, the plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.      That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.      That he be awarded punitive damages against the individual defendants; and

c.      That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.      For such other further and different relief as to the Court may seem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

Dated:   New York, New York
         December 6, 2011

Respectfully Submitted,

/s/

By:   _____
      David B. Rankin
      Robert M. Quackenbush
      Law Office of Rankin & Taylor
      *Attorneys for the Plaintiff*
      350 Broadway, Suite 701
      New York, New York 10013
      t: 212-226-4507