UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------
x
JOHN GAD ALLA,

                  Plaintiff,

          -against-

New York City Police Department Officer
("P.O.") BRIAN VERKAY (Shield No.
2055), P.O. TANISHA DORSON (Shield
No. 03481), SERGEANT ("SGT.")
DOMAGOJ ANTICEV (Shield No. l4),
P.O. ANSARI KALIL (Shield No. 11189),

                  Defendants.

-------------------------------------------------------
x

**MEMORANDUM AND ORDER**
11-CV-892 (FB) (RLM)

*Appearances:*
*For Plaintiff:*
MICHAEL L. SPIEGEL, ESQ.
11 Park Place, Suite 914
New York, NY 10007

*For Defendants:*
MICHAEL A. CARDOZO, ESQ.
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

By:   RAJU SUNDARAN, ESQ.
       Senior Counsel

**BLOCK, Senior District Judge:**

      After an eight-day trial, the jury in this § 1983 action found that police officer

Brian Verkay ("Verkay") used excessive force in the course of arresting John Gad Alla

("Gad Alla") for a crime he did not commit.  The jury further found that Verkay and fellow

officer Tanisha Dorson ("Dorson") subsequently falsely arrested Gad Alla for resisting

arrest and obstructing governmental administration.

      The jury awarded a total of $2.5 million in damages.  On the excessive force

claim, it awarded $1.9 million against Verkay: $1.5 million in compensatory economic damages, $250,000 in compensatory non-economic damages and $150,000 in punitive damages. On the false arrest claim, it awarded $300,000 in compensatory damages against Verkay and Dorson, jointly and severally, and $150,000 in punitive damages against each officer, for a total of $600,000.[1]

Now before the Court are the parties' various post-trial motions. Gad Alla moves for judgment as a matter of law pursuant to Federal Rule 50(b), arguing that there was no probable cause for his initial arrest.

As for the defendants, Verkay and Dorson move for judgment as a matter of law under Rule 50(b) or, in the alterative, for a new trial under Rule 59. Both Dorson and Verkay argue that they are entitled to qualified immunity, while Dorson alone argues that she was not personally involved in the second arrest. With respect to damages on the false arrest claim, Dorson and Verkay argue that the award for compensatory damages should be reduced, and that the award for punitive damages should be vacated or, in the alternative, reduced. With respect to damages on the excessive force claim, Verkay argues that each element of the award should be vacated or, in the alternative, reduced.

For the reasons set forth below, Gad Alla's motion is denied. Defendants' motions are granted in part and denied in part. More specifically, the Court orders a new trial limited to economic damages on the excessive force claim. The remainder of the jury's

---

[1]Gad Alla also asserted state-law claims for battery and false arrest. The Court concluded that the state and federal claims merged and, accordingly, presented the claims to the jury simply as "false arrest" and "excessive force."

award—totaling $1 million—stands.

# TABLE OF CONTENTS

## I

A. Facts Relating to Liability ................................................. 4
  1. Overview ........................................................... 4
  2. The 911 Call ....................................................... 4
  3. The Police Response ................................................ 5
  4. The First Arrest ................................................... 6
    a. Gad Alla ........................................................ 6
    b. Anticev and Kalil .............................................. 9
    c. Dorson ......................................................... 9
    d. Verkay ......................................................... 10
    e. Summary ........................................................ 12
  5. The Show-Up Identification .......................................... 12
  6. Police Reports of the Incident ...................................... 13
  7. The Second Arrest .................................................. 13
B. Facts Relating to Damages ................................................ 14
  1. Gad Alla's Background .............................................. 14
  2. Immediate Aftermath of the Punch and Arrest ........................ 15
  3. Long-Term Impact .................................................. 17
    a. On Gad Alla's Mental and Physical Health ........................ 17
    b. On Gad Alla's Employment Prospects ............................. 20
  4. Expert Testimony .................................................. 21
    a. Oral Maxillofacial Experts ..................................... 21
    b. Psychology and Psychiatry Experts .............................. 22
    c. Life-Care Plan Expert .......................................... 24
    d. Economic Expert ................................................ 24

## II

A. Probable Cause for the First Arrest ...................................... 26
B. Dorson's Participation in the Second Arrest .............................. 28
C. Qualified Immunity ...................................................... 29
  1. Excessive Force (Verkay) ........................................... 31
  2. False Arrest (Verkay and Dorson) ................................... 33
D. Damages ................................................................. 35
  1. False Arrest: Compensatory Damages ................................. 35
  2. False Arrest: Punitive Damages ..................................... 37
    a. Vacatur ........................................................ 37
    b. Reduction ...................................................... 38

3. Excessive Force: Compensatory Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    a. Economic Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    b. Non-Economic Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
4. Excessive Force: Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    a. Vacatur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    b. Reduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**III**

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**I**

Because the nature of these motions requires a full appreciation of the underlying facts, they must be explored in some detail.

**A. Facts Relating to Liability**

*1. Overview*

Although many facts were disputed at trial, certain matters are not in dispute. Gad Alla was initially arrested for assaulting someone who lived in his building. In the course of executing the arrest, Verkay punched Gad Alla in the face. Gad Alla was released at the scene after the assault victim stated that Gad Alla was not the perpetrator. However, Verkay later returned to the scene with Dorson to arrest Gad Alla for resisting arrest and obstructing governmental administration. Gad Alla, severely injured from the earlier incident, was held in custody for roughly nine hours before being released.

*2. The 911 Call*

In September 2010, Gad Alla was sharing a bedroom on the second floor of a Brooklyn residence with his friend Said Said. Other bedrooms were occupied by Tamer Botros ("Botros") and Wael Beshay ("Beshay"). The second-floor occupants shared a living

area, kitchen and bathroom; all were Egyptian men.

On the night of September 10th, Gad Alla was sitting in his room when he heard Botros yelling. Opening the bedroom door, Gad Alla saw Botros and Beshay fighting in the kitchen:

> So Wael [i.e., Beshay] had this knife and it was hidden in his hand, like that, so he actually tried to attack him [i.e., Botros]. The guy ran, and my door was opened, that was the only door opened in front of him, so he jumped on . . . my roommate's bed. He jumped on the bed, and this guy's after him, and he actually hit him with the back of the knife on his head. I was ascared [sic]. I was standing at a distance just a few feet I'm like please, for God's sake, please for God's sake, don't do it, don't do it. But I couldn't interfere, this guy is huge, I can't really do anything about it. And then I start seeing the blood running all over his face.
>
> The guy went back to his room and the bleeding guy ran downstairs, so I put on my slippers and I ran after him and I -- just wait for me, I'm going to take you to the hospital, and he was happy, I don't know why. Apparently he meant to do something to him, and then he grabbed his phone and he just walked away, so I assumed he called 911. It just happened, all this in probably two minutes, the whole thing, so I walked up to my room and I just sat there.

Trial Tr. 57-58.

Gad Alla's hunch that Botros had called 911 was correct. At 10:57 pm, a New York Police Department ("NYPD") dispatcher reported the call over police radio, stating that a man had been stabbed by an Egyptian male wearing a white t-shirt.

### 3. *The Police Response*

Sergeant Domagoj Anticev ("Anticev") and Office Ansari Kalil ("Kalil") were the first to respond. They met Botros, who was bleeding from his face, outside the

residence.  Botros stated that he had been stabbed by a male Egyptian who was wearing a white t-shirt and was inside the residence.  Anticev and Kalil then went into the building.

Verkay and Dorson arrived at the scene shortly thereafter.  Botros, still outside, told Verkay that his attacker "was an Egyptian man wearing a white shirt, that he was on the second floor and that the cops were with him." Trial Tr. 1026.  Verkay ran inside after hearing someone repeatedly shouting "show me your hands."  Trial Tr. 1025.

### 4. *The First Arrest*

It is at this point that the participants' stories diverge.  Each witness's version of events is presented in turn.

### a.  Gad Alla

Gad Alla testified that he was in his room when the officers entered the residence:

> I sat there on my bed and I had my laptop with me.  And then just a few minutes, you know, I heard this scream, "police," "police."  So I stood up, and then in a second I heard it in front of my room.  They're like, "police, open the doors," "open the doors."

> So I opened the door for my room and then there is a gun, right there, to my left, there is an officer with a gun, and then there are a bunch of them over there and everybody is saying something, so I'm just focused on this gun right there in my face.  "Put your hands up," so I do this.

Trial Tr. 59.  Gad Alla identified Anticev as the officer holding the gun.

Gad Alla testified to what happened next:

> And then two of them grab my arms and then they push me backwards in the room.  It was a coffee table down there, and then somehow I came down on the coffee table chest first,

6

> that's where I hit my chest at that time.  I was only concerned
> about my arms.  As you can see, I have very skinny arms.  So
> I was just randomly going, "do whatever you want, but don't
> hurt me," "do whatever you want, but don't hurt me."

Trial Tr. 60.  Gad Alla explained that the side of the coffee table broke and "came down on

the floor."  Trial Tr. 70.

> Gad Alla's narrative continues with the following description:

> After I came on the table, then on the floor, and I remember
> that feeling because the carpet was not very clean in that room,
> so I remember my cheek was on that carpet.  And then all of a
> sudden they lift me up and then on the bed, which is to the left,
> they put me down pressing on me.  Somebody, I remember his
> hand, still in my back.  He was just pressing so hard, and then
> my arms behind me.

Trial Tr. 60.

According to Gad Alla, he was not handcuffed on the carpet, but "[t]hey were

holding my hands behind my back."  Trial Tr. 71.  When asked how many officers were

holding him down, he stated: "I have no idea.  I was down on my face, so I don't really

know.  But I remember somebody had [a] very strong fist right in the middle of my back

and pressing." Trial Tr. 76.  He also testified that "[t]here was a police officer next to me on

the bed, but I don't really remember who was that at that time." Trial Tr. 76.  Gad Alla,

who is small in stature, testified that he was not "resist[ing] them in any way."  Trial Tr. 71;

*see also id.* at 72 ("They are like giant cops, four or five of them maybe in my room, how

could I resist all of that?").

Gad Alla was placed face-down on a bed and handcuffed.  He testified that

he was punched at that point:

> I was down on my face this way with my hands behind me.
> And then I'm looking out of the side of my eye, I see the door
> of the room, and I just saw legs up to maybe the knees just
> running into the room.  So I turned my face very quick, you
> know, expecting, you know, whatever is coming my way.  And
> then I only saw a foot stepping on the bed. . . . [H]is left foot is
> here and then he was standing right here, and he just punched
> me right there.
>
> Well, like I was just dazed, just in a different world right away.
> I don't even know what's going on.  I'm just—I hear the
> officers talking, doing whatever.  One of them was like "hey",
> "hey", "hey", right after the punch, that's all I remember.  And
> then I hear those voices in the back of my head, but I'm not
> really aware of what's going on there.

Trial Tr. 74-76.  He further testified that the person who punched him said, "That's how we

do it."  Trial Tr. 60.  Gad Alla subsequently learned that Verkay was the officer who had

run into the room and punched him.

At that point, "[m]aybe one [or] two" officers lifted Gad Alla from the bed

and "just pushed [him] against the fridge."  Trial Tr. 77.  Gad Alla tried to say "'it's not me,

it's not me, it's not me," but "they actually pressed my head very hard preventing my lips

from speaking."  Trial Tr. 78; *see also id.* ("[Verkay] was on me, and he's like that, 'don't say

anything.'").  Gad Alla recalled being held up against the refrigerator for "[p]robably a few

seconds, half a minute."  Trial Tr. 78.

In the days following, Gad Alla wrote two emails describing the incident.

The version of events in the emails (punched, handcuffed, pushed into the refrigerator) was

inconsistent with his trial testimony (handcuffed, punched, pushed into the refrigerator).

Gad Alla explained at trial that he was not sure was was happening right after the incident

due to his head injury, but that he was now "absolutely sure" that he was handcuffed

before the punch.  Trial Tr. 151.

**b.  Anticev and Kalil**

Anticev and Kalil were the first officers to arrive on the second floor.  Both gave generally consistent accounts.  Both testified that they intended to place Gad Alla under arrest for assault.  Both testified that Gad Alla ignored their warnings not to move and to show his hands, and instead retreated into his bedroom.  Both testified that other officers came into Gad Alla's bedroom, knocking down Anticev and Kalil in the process.  Both testified that Gad Alla was already handcuffed by the time they got to their feet, and that they were unable to see what happened in the interim.  Both left after seeing Gad Alla in handcuffs.

**c.  Dorson**

Dorson testified that she entered the building with Verkay and proceeded to the second floor.  She did not recall bumping into other officers or seeing anyone fall to the ground, but testified that an unidentified officer tripped over a coffee table, breaking one of the table's legs.

According to Dorson, Verkay grabbed Gad Alla's arm in an attempt to handcuff him.  Gad Alla "pushed off," causing Verkay to fall face-up onto a bed with Gad Alla—also face-up—on top of him.  Trial Tr. 384-85.  She unsuccessfully tried to pull Gad Alla off of Verkay.

Dorson testified that Verkay was eventually able to free one of his arms, and that he punched Gad Alla once.  She recalled grabbing Gad Alla's arms, but could not remember whether she was the one to handcuff him.  *See* Trial Tr. 383 ("I know there were

handcuffs involved, but I do not remember if I indeed put the handcuffs on him.").

Dorson's trial testimony was inconsistent, in some respects, with her deposition testimony. At her deposition, Dorson testified that both she and Verkay were kneeling on the bed while Gad Alla was lying on it. At trial, Dorson explained that the positioning she described at her deposition referred to the state of affairs after Verkay had pushed Gad Alla off of him.

Dorson recorded in her memo book that Gad Alla was "fighting/resisting with two uniformed PO's (housing)." Trial Tr. 464. At trial, however, she testified only that she saw Anticev and Kalil "engaging" Gad Alla. Trial Tr. 463. She denied seeing Gad Alla fighting with the two officers. *See* Trial Tr. 473 ("I did not see it . . . . I cannot testify as to what he was doing."). In response to a question from the Court, Dorson stated that the basis for her note was that Gad Alla was "[r]efusing to give his hands to be handcuffed." Trial Tr. 470.

### d. Verkay

According to his testimony, Verkay entered the residence followed by Dorson. When he reached Gad Alla's room, he saw an Egyptian man in a white t-shirt and two officers, later identified as Anticev and Kalil. In contrast to Kalil's testimony that he never touched Gad Alla, Verkay testified that he saw Kalil trying to control Gad Alla's arm. Verkay stated that he assisted Kalil:

> [B]ased upon all the information that's available to me at the time, the description over the radio, the second description from the actual victim, him telling me exactly where he was, and I have a person that looks exactly like the victim described, he's exactly where the victim said he would be, and now,

10

> based upon that, I see officers stopping him . . . and he's
> pulling away from them.

Trial Tr. 1030-31. Verkay did not clearly remember knocking any officers down on his way into the room, but conceded that he "may have." Trial Tr. 961.

On direct examination, Verkay testified that he did not know what caused Gad Alla and him to fall onto the bed; however, on cross-examination, Verkay testified that he tried to pull Gad Alla's arm behind his back and that they both stumbled when Gad Alla pulled his arm away. Verkay stated that that he landed on his back on the bed with Gad Alla on top of him. He testified that he could not push Gad Alla off because his hands were trapped, but conceded that he somehow managed to strike Gad All in the head with a closed fist. The blow startled Gad Alla, which allowed Verkay to free himself and move Gad Alla, face down, onto the floor.

Contrary to Dorson's testimony, Verkay stated that he did not remember Gad Alla ever "being on the bed face down." Trial Tr. 981. His recollection was that he had handcuffed Gad Alla on the floor, with another officer helping him pull Gad Alla's hands from underneath his abdomen. Verkay did not mention a bed in his arrest report, recording only that he had "[o]bserved two uniformed police officers attempting to restrain defendants [sic] . . . with all parties falling to the floor." Trial Tr. 984.

**e. Summary**

The jury was presented with numerous versions of the facts leading up to Gad Alla's initial arrest. Gad Alla testified that he complied with orders to show his hands, while Anticev and Kalil testified that he refused. Gad Alla testified that Anticev and Kalil

11

grabbed his arms, while Kalil testified that they did not touch him.  Anticev and Kalil claimed that other officers ran into the room and knocked them to the ground, though Dorson and Verkay did not remember seeing anyone on the floor.  Gad Alla testified that he fell onto a coffee table, breaking it, and then was lifted off the floor and onto the bed. Dorson testified that the coffee table broke when an officer tripped over it.

Dorson and Verkay testified that Gad Alla resisted their attempts to grab him, causing Verkay to fall face-up onto the bed with Gad Alla lying face-up on top of him. Dorson and Verkay both testified Verkay punched Gad Alla—who was not yet handcuffed—from that position.  Dorson testified that the punch caused Gad Alla to roll onto his chest, but Verkay did not remember Gad Alla ever being face-down on the bed.

Gad Alla, to the contrary, testified that an officer pushed him face-down on to the bed, pinned his hands behind him, and handcuffed him.  It was only then that Verkay came into the room and punched him in the face.

### 5. *The Show-Up Identification*

Once Gad Alla was handcuffed, other officers brought Botros upstairs for a show-up identification.  Botros told them that Gad Alla was not his assailant. Gad Alla was uncuffed.  Verkay apologized and brought Gad Alla an ice pack. Shortly thereafter, Beshay returned to the residence.  He told Dorson that he was the one the police were looking for, and she placed him under arrest.

Gad Alla initially declined Verkay's offer to go to an ambulance waiting downstairs.  Gad Alla called an ambulance later, but sent it away when another resident told him that he would not be able to afford hospital bills without insurance.

### 6. *Police Reports of the Incident*

Verkay and Dorson made nearly identical entries in their respective memo books.  Verkay's memo book stated: "Egyptian appearing male with white shirt fighting, resisting with two uniformed police officers (housing?)."  Trial Tr. 484.  Dorson's memo book stated: "Egyptian male with white t-shirt fighting/resisting with two uniformed PO's (housing)."  Trial Tr. 464.  Both officers noted a "strike to perp check," with Verkay recording "pain to the left cheek" and Dorson recording "pain to left cheek near ear."  Trial Tr. 484-85.   It is undisputed that Gad Alla was hit in the right cheek.

Verkay explained the similarity between the two memo book entries by candidly admitting that he wrote his entry first and then showed it to Dorson.  He described the practice as "commonplace."  Trial Tr. 990.  Dorson, on the other hand, testified that the information in her entry "didn't come from Officer Verkay."  Trial Tr. 483.

Verkay completed a stop-and-frisk report at the same time as his memo book entry.  In the stop-and-frisk report, Verkay stated that he had "[o]bserved struggling with two uniformed PO who attempted to . . . [r]estrain the cuffed suspect." Trial Tr. 998.  On his booking arrest worksheet, Verkay wrote "physical force to control defendant," then crossed that out and wrote "minimum necessary physical force to control defendant."  Trial Tr. 1059-60.

### 7. *The Second Arrest*

Verkay reported the incident to Lieutenant John Ganley ("Ganley").  He testified that he told Ganley both that he had punched Gad Alla, and that Gad Alla was not Botros's assailant.  Based on Verkay's description of the incident, Ganley instructed Verkay

to arrest Gad Alla for obstructing governmental administration and resisting arrest.

Verkay and Dorson returned to Gad Alla's residence at around midnight. Verkay apologized to Gad Alla, but told him that his supervisor had instructed him to make the arrest.

Gad Alla was compliant. He testified that "[t]hey put the handcuffs, I think Officer Dorson did," Trial Tr. 86; Dorson denies this. He was then taken to the precinct for booking. He was released from custody at around 9 or 10 in the morning, having spent nine hours and 14 minutes in jail.

Verkay forwarded his paperwork to the District Attorney's office. He later spoke to a representative from that office and relayed the facts to her. At trial, Verkay could not remember whether anyone had asked him for the identity of the two officers who were struggling with Gad Alla. Verkay testified that he did not know their identity at the time, but that he could easily have figured it out based on police records. In any event, the District Attorney's office did not pursue criminal charges.

## B. Facts Relating to Damages

### 1. Gad Alla's Background

Gad Alla grew up in Egypt. He received a bachelor's degree in Egyptology, which he explained as analogous to archeology, and he worked as a licensed Egyptologist tour guide. He moved to the United States in 2004, though he made several extended trips back to Egypt. In 2007, he earned a gross income of $16,967 as a translator for the Department of Education and the Bureau of Prisons, and as a distributor of audio guides at a museum. In 2008, he earned a gross income of $34,958 by working as a translator. In

14

2009, his gross income was $22,903, which included translating and cultural awareness work at West Point Military Academy.

Gad Alla planned to work for the United States government and applied to be an interpreter in Iraq. He passed a proficiency exam and qualified for security clearance for a position with a salary of $150,000. He was disqualified due to his green-card status, so he reapplied after obtaining citizenship in early 2010. Gad Alla received an offer contingent upon a medical examination in August 2010. On September 2, however, he discovered that he was disqualified due to elevated cholesterol, and was told to come back once it was lowered. He started taking over-the-counter medication and exercising. Gad Alla earned roughly $300 in 2010.

### 2. *Immediate Aftermath of the Punch and Arrest*

After being uncuffed, Gad Alla ran to the sink to run cold water over his head. He described how he was feeling:

> Like, you know, like sometimes what they call daydreaming, you're there, your body is there, but your head is just spinning somewhere else. I'm totally dizzy. I stood up and I can't stand up. There was an officer right there next to me standing there, so I leaned with my head over his shoulder, and then they brought me a chair that was in the living area and they had me sit down there.

Trial Tr. 79.

Gad Alla testified that being arrested and jailed was "the most terrifying" moment in his life, Trial Tr. 86, and that he was "petrified" because "the only thing I could picture in my head is I'm getting raped in there," Trial Tr. 87. He described his physical and mental state in jail as follows:

> [M]y brain is not functioning.  The moment I sat down in the cell I started feeling this horrible pain in my left rib cage and I can't even sit. I lay on floor of the cell, I can't lay down, they get me, they sit me on the bench there and I can't do anything. So I remember this guy Wael and he told them, he really need help.  At sometime during the night, I don't really know what time, they get me . . . two guys to check my pulse and they said, what's going on and I said, you know, my head is just spinning, I don't know what to do and my rib cage is totally in pain. . . .
>
> [T]his pain was killing me, I can't even sit down. I can't breathe. I can't even use the bathroom, it was just across from the cell. I can't walk. And that guy Wael is trying to help me sit there. Sit on the floor, go do this. I couldn't. I'm still in this bad dream, my brain is floating somewhere else.

Trial Tr. 90-92.

Robert Martucci, an emergency medical technician, examined Gad Alla while he was in custody.  He observed normal vital signs and alert mental status, and saw no signs of bleeding, bruising or swelling.  He completed a written report:

> Patient states he was punched and has pain in his head and left side.  Because he was resisting arrest from PD.  Patient states he feels fine and doesn't want to go to the hospital.  Patient signs refusal of medical aid witnessed by Police Department.

Trial Tr. 1192, 1202.  Martucci did not note any complaints of dizziness, chest pain, difficulty breathing, or headaches.

Gad Alla testified that he refused to go to the hospital because he was scared that he was going to be kept there for "three days in cuffs." Trial Tr. 177.  In addition, he denied telling Martucci that he was resisting arrest; during his cross-examination of Martucci, Gad Alla's counsel pointed out that Martucci's notation of "resisting arrest" was was not preceded by "patient states" or bound by quotation marks.

16

Verkay testified that he checked on Gad Alla at least every half hour during his confinement, and that Gad Alla did not complain to him about anything or appear to have any trouble talking.  However, Verkay completed a Medical Treatment of Prisoner form on which he noted Gad Alla's complaints "of pain to his right cheek face and left ribs from injuries sustained while struggling fighting with police." Trial Tr. 1013.  Despite this notation, Verkay testified at trial that "nothing happened to [Gad Alla's] left ribs."  Trial Tr. 1016.

### 3. Long-Term Impact

**a.  On Gad Alla's Mental and Physical Health**

Gad Alla testified that he continues to experience pressure headaches and cannot fully open his jaw.   His rib pain eventually went away, but it still prevents him from exercising.  He also testified that he has had recurring nightmares involving police.

Gad Alla described the lingering impact of the incident on his mental state at some length:

> My major problem in my life now . . . is actually the focusing problem, like, lack of concentration.  Everyday let's say I go to the post office to send something, and then I live on the third floor, I go down and oh, I forgot my keys, I go up the stairs all the way and then I say, oh, I forgot my glasses, and then I go up there, and then I forget whatever I have taken to the post office.  I drive my car, I make the wrong turn on a one-way street.  And then let's say instead of going to the bathroom I find myself, I have my pants in my hands.  Sometimes it looks funny in front of my roommates, but this is my life, like, everyday this concentration problem, even if I'm watching a video or something, YouTube or listening to something, and then I drift off and I find out I'm not there, I have to replay [over] and [over] again.

So if somebody is thinking normally one, two, three, four, five, six, I think one, two and then I jump to eight and then I came back to four or five.  This is the easiest way to understand what's going on with my head. . . .

The short memory is the worse actually.  Sometimes I forget that I just took my medicine and I don't really know, and then I take it again, not sure what just happened, like, a minute ago.  I put my glasses somewhere and then I keep—this is every single minute, I swear.  I put my glasses in there and then I look for them, and I look for my pen, I look at it, whatever is there.  I'm all day long.  If I am doing something with my roommates, they were cooking something or whatever, I try to help just being there.  I hold this just a week ago and I spill this whole thing, the hot food on my roommate's foot.  And I feel so bad.  And they say, don't worry, this is normal, it happens with everybody, but I know it doesn't happen with everybody.  This is just a huge change in my life.

Trial Tr. 116-17.

Gad Alla testified that the incident altered his emotional state and social life:

And after those nightmares that I had—and it started appearing when I started, like, dealing more with people.  Like, my roommate, you know, once I freaked out all of a sudden, he was just joking with me and I started hitting him hard not knowing what I did.  It did happen once with my brother, I remember, and I almost broke my relation with him as a brother and told him I didn't want to see you anymore.  And I start coming back to myself and I feel bad for what I'm doing, I don't really know, I don't realize what I'm doing.

Socializing, going to church, which was like my life in Brooklyn, everything that I do is related to the church, family, we go out, we have fun, we go for a dinner, whatever we did, I don't do it anymore.  I'm living in prison since this thing happened to me for over two years, I'm stuck in my room, and they are wondering what's going on, they call me, they check on me, but nobody could actually feel what I'm feeling and going through all of this for over two years all what I'm doing is I'm just going to doctors and trying to deal with these injuries and God knows what's going on. . . .

18

> [M]y mood, you know, the changes that I'm getting, socializing
> of course, it just died out of my life. You know, thinking about
> my future, you know, marriage, whatever I had before, it just
> adds to my list, I don't really think about that anymore, I'm
> just trying to figure out where I'm going to live.

Trial Tr. 114-15, 120-21.  He testified that these changes have left him depressed.

> Finally, Gad Alla testified to the effect of the incident on his physical abilities:

> Sir, I am here, I exist. I move, I live, I cook, I go out to buy food,
> I go to the post office, so I live like any other person, but I have
> some other disability.  When I say that I cannot bend over to
> pick up something, that doesn't mean that it's impossible to do
> it, I can do it, but there is pain. . . . I can move.  I can sit, like I'm
> sitting here, although I'm wearing this belt around my waist.
> You know, I can read stuff, I can go online, I can talk to people.
> I survive.  I live my own life, but I have some difficulties . . . .

Tr. 299.  He also testified that his vision has been worsening, and that he does not walk straight.

Thomas Edward ("Edward"), a close friend of Gad Alla's since 2008, described Gad Alla prior to the incident as being "ambitious," "normal," and a person who helps others in his church.  Trial Tr. 539.  In describing Gad Alla after the incident, Edward stated:

> Now, he doesn't have ambition.  He constantly has headache
> in his head, his side, he does not move a lot.  He's staying in
> the room, he does not go out a lot. . . . The activities that he
> used to do before, he cannot do them now.

Trial Tr. 540.  When Edward tried to play sports with Gad Alla, he had to take him to the emergency room the next day.  Edward also testified that Gad Alla has memory problems, such as leaving the oven on, going upstairs to get something but returning without it, and

forgetting his keys.

**b. On Gad Alla's Employment Prospects**

After the incident, Gad Alla worked for three weeks from May to June 2011 as part of a cultural awareness program at West Point Military Academy, but his friends in the program were forced to cover for him due to the pain that he was experiencing. He applied for a translating job in July 2011, but he found the translating test too difficult to complete and gave up. He then applied for an interpreter position in November 2011, but performed so poorly on the test that he assumed that he failed. In December 2011, he completed a translating assignment at Bellevue Hospital that took less than one day, explaining that written translation is somewhat easier for him because it can be done slowly and with access to a dictionary. Gad Alla testified that his "hopes and dreams" of working as an interpreter are gone. Trial Tr. 128.

Gad Alla made some effort to earn money in other ways. In 2011, he bought jewelry and tried to sell it at a flea market in New Jersey; he stopped because it was too difficult and people were stealing from him. He also tried to make and sell custom jewelry online, but pain has also largely prevented him from doing this. He estimated that he "probably" earned $10,000 or $11,000 in 2012. Trial Tr. 311.

Gad Alla testified that his outlook "job-wise" is bleak: "[W]hat I'm thinking now is just go somewhere with either my brother or my sister and just live with them." Trial Tr. 129-30. At the time of the trial, Gad Alla was 34 years old and was being supported by payments from his brother.

*4. Expert Testimony*

20

### a. Oral Maxillofacial Experts

Dr. Arthur Elias ("Elias"), an oral maxillofacial surgeon, was retained by Gad Alla and testified at trial. He examined Gad Alla on June 30, 2011, and concluded that Gad Alla had a broken zygomatic arch, a bone that extends from the front of the ear to the cheekbone. He has treated hundreds of such fractures in the course of his 40-year practice.

Elias testified that it would take "considerable force" to break the arch. Trial Tr. 428. He explained that Gad Alla's fracture was never repaired, which has caused limited jaw motion and pressure headaches related to muscle function around his temple. He opined that Gad Alla's complaints "were reasonable in terms of the clinical findings from the injury," and that "[h]is complaints will not change because the bones are now healed in the position into which they were displaced by the injury and were never brought back to their position before the injury," Trial Tr. 420; in other words, the injury is permanent. He opined that Gad Alla will continue to experience discomfort, but did not know how limiting it would be.

Dr. Jay P. Goldsmith ("Goldsmith"), also an oral maxillofacial surgeon, testified on behalf of the defendants. Like Elias, he has treated hundreds of patients for zygomatic arch fractures. Goldsmith agreed that Gad Alla sustained a fractured zygomatic arch, but opined that he had no remaining facial deformity and was able to use his jaw normally. He testified that headaches are not commonly found with such fracture and, further, that none of his patients suffered a traumatic brain injury ("TBI") as a result of the fracture.

**b. Psychology and Psychiatry Experts**

Dr. Mary Hibbard ("Hibbard") is a neuro-rehabilitation psychologist with 25 years of experience.  She examined Gad Alla on September 8 and 15, 2011, observing that Gad Alla "looked very depressed," that "his emotions were blunted," and that "[i]t took him a long time to organize what he wanted to tell you and occasionally he would kind of go off topic."  Trial Tr. 641.  She also observed that he had "severe memory impairments," Trial Tr. 711, as well as problems with concentration and organization.  She administered 25 neuropsychological tests in the course of her examinations.

Hibbard opined that Gad Alla sustained a mild TBI from the punch to his head, explaining that the impact would have caused Gad Alla's brain to shake back and forth, impairing the nerves that go through the brain.  She also diagnosed a cognitive disorder, major depression, post-traumatic stress disorder ("PTSD"), and chronic pain, all secondary to the TBI and assault.  She testified that the impairments had "significant physical[,] cognitive and emotional consequences."  Trial Tr. 623.

Hibbard testified that Gad Alla was "permanently disabled[,] fully disabled" when she examined him.  Trial Tr. 646.  She testified that "there will be some functional improvement with rehabilitation," Trial Tr. 646, but could not say how much.  She opined that Gad Alla was "[p]otentially" employable, but that it was "[h]ighly unlikely" that he would be employable at his pre-injury level, Trial Tr. 646; in particular, she ruled out a career as an interpreter.  She noted that "traumatic brain injury is a lifelong disability and that unemployment is extremely high with traumatic brain injury with less than 15 to 20 percent of people able to hold down full-time employment."  Trial Tr. 646-47.

22

In terms of rehabilitation, Hibbard recommended cognitive remediation, medication to address headaches and rib pain, evaluation for medication for his attention problem, referral for stimulus therapy for his balance problems, and psychological services. Even with rehabilitation, her "prognosis was guarded." Trial Tr. 646.

On cross-examination, Hibbard admitted that her report referred to malingering. She explained that one of the tests she administered identified a possibility that Gad Alla was exaggerating, but that she determined that he was not. She found Gad Alla to be a "classic example of someone who is honest" and answered yes "to the things that he's been reporting all the way along." Trial Tr. 708-09. She also stated that "the fact that there were many things [on the tests] that Mr. Gad Alla did very well with, was really a support of nonmalingering behavior." Trial Tr. 727.

The defendants retained two psychological experts. Dr. DeAnsin Parker ("Parker"), a neuro-psychologist, evaluated Gad Alla in March 2012. She opined that he suffered from depression, but not a TBI or PTSD. She also concluded that Gad Alla was malingering based on noncompliance and suboptimal performance on certain tests. She found that he had a "spotty work history" and "probably has conflictual relationships with people." Trial Tr. 1166. Dr. Steven Fayer ("Fayer"), a psychiatrist, agreed that Gad Alla did not have a TBI or PTSD, observing that Gad Alla's living at the Brooklyn residence for several months was not consistent with the latter condition. Instead, he diagnosed depressive disorder and adjustment disorder, adding that, in his opinion, Gad Alla suffered from some level of depression prior to the incident. Fayer also opined that Gad Alla's complaints of memory loss, rib pain, and pressure headaches were not consistent

23

with his self-reported activities since the incident, nor with his ability to sit in court for several hours.  Overall, Fayer opined that Gad Alla was exaggerating his symptoms, and that he was not fully disabled.

**c.  Life-Care Plan Expert**

Dianne Simmons-Grab ("Simmons-Grab"), a certified disability manager specialist, prepared a life-care plan for Gad Alla.  She estimated his total medical and related expenses to be between $666,000 and $1,193,000.  She opined that he needs intensive psychological counseling due to PTSD and depression; special prism glasses and a vestibular evaluation to help with balance; physical therapy for his pain; cognitive therapy for his memory and thought-processing issues; and a psychiatric evaluation to determine whether he needs medication for his sleep problems and anxiety.  Her life-care plan also allotted money for yoga, aqua therapy, acupuncture, and meditation tapes.

Though Simmons-Grab is not a doctor, she identified which doctors had recommended which treatments.  Her estimates were based on the assumption that the frequency and intensity—and therefore the cost—of certain items in Gad Alla's life-care plan would decrease over time; she also recognized that certain items imposed one-time costs.

Simmons-Grab testified that Gad Alla would need a case manager to help him to organize and follow through with his therapies.  Finally, she opined that Gad Alla would not be able to work "to his highest capacity" until the treatments were completed. Trial Tr. 940.

**d.  Economic Expert**

24

Dr. Gary Crakes ("Crakes"), an economist, was retained by Gad Alla to assess his loss of earning capacity, as well as the present value of the cost of his future medical and related expenses.   Crakes provided three scenarios for the jury to consider: (1) the median annual earnings of males with a bachelor's degree, yielding a total discounted economic loss of $2,756,702; (2) the $150,000 annual salary he would have earned as an interpreter in Iraq, yielding a total discounted economic loss of $4,579,707; or (3) annual earnings of $34,000, yielding a total discounted economic loss of $1,871,112.   The third scenario was based solely on Gad Alla's 2008 earnings.   In addition, Crakes believed the $34,000 figure for 2008 to be Gad Alla's net earnings, when in fact it represented his gross earnings.   Crakes testified that he could not adjust the third scenario because he did not have information about Gad Alla's expenses.

As instructed by Gad Alla's counsel, Crakes assumed in all three of his scenarios that Gad Alla would never work again; he was unaware that Gad Alla had completed a translating job in December 2011.   In response to an inquiry from the Court, he acknowledged that a limited ability to work would affect his calculations.   *See* Trial Tr. 590 ("If I were provided with what type of earnings they would experience with their impairment, then I would subtract that from the analysis.").   He testified that he had no way of estimating how his figures would change if Gad Alla could still work in some capacity.

## II

The parties advance several claims in their post-trial motions.   The Court will address them in the following order:

25

(A)     The Court considers, and rejects, Gad Alla's motion, which seeks judgment as a matter of law that there was no probable cause for the first arrest.

(B)     The Court addresses, and rejects, Dorson's claim that there was insufficient evidence linking her to the second arrest.

(C)     The Court addresses, and rejects, Verkay's contention that he is entitled to qualified immunity on the excessive force claim, as well as Verkay and Dorson's contention that they are entitled to qualified immunity for the second arrest.

(D)     Finally, the Court addresses Dorson and Verkay's various challenges to the damages awards, and agrees that the evidence does not support the jury's finding that Verkay's use of excessive force caused Gad Alla $1.5 million dollars in economic damages.

## A.  Probable Cause for the First Arrest

Before the case was submitted to the jury, both Gad Alla and the defendants asked the Court to resolve, as a matter of law, Gad Alla's claim that the first arrest was unlawful.  The Court held that there was probable cause for the first arrest and, accordingly, did not present that claim to the jury.[2]

Gad Alla now renews his request for a ruling as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).  The purpose of his request is not clear.  He does not expressly argue that the Court erred in refusing to send the claim to the jury.  Nor—presumably in light of the jury's substantial award—does he seek a new trial.  Instead, Gad Alla vaguely seeks partial judgment as a matter of law, "together with such other and

---

[2]Although Gad Alla was never formally charged with assaulting Botros, it is undisputed that the officers' conduct amounted to an arrest.

further relief as is just and proper." Pl.'s Mot. at 10.

In any event, the first arrest was clearly supported by probable cause. "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin,* 494 F.3d 344, 368. (2d Cir. 2007). Its existence is assessed based on "the totality of the circumstances." *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007).

Gad Alla argues that Botros's description of his assailant—an Egyptian male in a white shirt—could have applied to any of the men living at the Brooklyn residence. Nevertheless, officers found Gad Alla at the scene of the crime shortly after it occurred; there is no evidence that they saw anyone else matching the perpetrator's description. In *Jenkins*, by contrast, there was a temporal and physical gap between the defendant and the crime scene. *See id.* at 91 ("[T]here was no evidence connecting th[e] crime to . . . Jenkins.").

Even if actual probable cause did not exist, qualified immunity would attach if officers of reasonable competence could disagree as to whether it did. *See Zellner,* 494 F.3d at 367. Although ultimately mistaken, the officers' belief that Gad Alla had assaulted Botros was reasonable and made in good faith based on the victim's report and their own observations.[3]

---

[3]Since Gad Alla does not contend that state law differs in any relevant respect, the Court also denies his Rule 50(b) motion with respect to his state-law claim for false arrest.

## B.  Dorson's Participation in the Second Arrest

"Before § 1983 damages are awarded, a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005).  While direct participation "requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal," this requirement "does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted).

There is sufficient evidence from which the jury could conclude that Dorson participated in the arrest in both direct and indirect ways.  Gad Alla testified that he thought Dorson was the one who handcuffed him.  Though she denied this, the jury could reasonably have credited his testimony over hers and found by a preponderance of the evidence that she made the arrest.

Further, the jury implicitly—but necessarily—found that the second arrest was not supported by probable cause.  That means that it rejected the testimony that Gad Alla resisted the first arrest.  Because Dorson was present during the initial incident, she had knowledge of the facts that rendered the second arrest unlawful.  Moreover, the jury could have reasonably found that Verkay and Dorson agreed to fabricate their accounts of the initial incident, *see Pearl v. City of Long Beach*, 296 F.3d 76, 87 (2d Cir. 2002) (explaining

that "it was a reasonable inference that the officers had agreed to present their allegedly false versions" given the identical nature of the officers' testimony), and that Dorson knew or should have known that Ganley would rely on them in ordering the second arrest. *Cf. Brown v. D'Amico*, 35 F.3d 97, 99 (2d Cir. 1994) ("Though an officer need not volunteer every fact that arguably cuts against the existence of probable cause [in a warrant application], the officer may not omit circumstances that are critical to the evaluation of probable cause."). Accordingly, sufficient evidence supports the jury's verdict as to Dorson's liability for false arrest.

## C.  Qualified Immunity

Verkay argues that he is entitled to qualified immunity for his use of excessive force. He and Dorson both argue that they are entitled to qualified immunity for the second arrest.

Qualified immunity is an affirmative defense. *See Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 134 (2d Cir. 2013). Gad Alla argues that Verkay and Dorson waived the defense by failing to raise it in a Rule 50(a) motion before the case went to the jury.

A Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). The Second Circuit has made clear that "[a]s to any issue on which proper Rule 50 motions were not made, [judgment as a matter of law] may not properly be granted by the district court . . . unless that action is required in order to prevent manifest injustice." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012). A manifest injustice occurs where "a jury's verdict is wholly

without legal support." *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 129 (2d Cir. 1999).

Both Verkay and Dorson made Rule 50(a) motions on a number of grounds.[4] Qualified immunity was not among them. They concede this, but argue that they preserved the issue by discussing it with the Court and Gad Alla's counsel at other points during the trial. The Court agrees with Judge Sullivan's conclusion in *Pereyra v. Fancy 57 Cleaners, Inc.*, 2013 WL 1385205 (S.D.N.Y. Mar. 20, 2013), that "awareness is not the standard Defendants must satisfy under Rule 50." *Id.* at *3. "If it were, then Rule 50's timing and specificity requirements would be meaningless because most every litigant is aware of the disputed elements in a lawsuit." *Id.*

Verkay and Dorson have not advanced any argument that barring them from raising qualified immunity at this late stage would create a manifest injustice. The Court agrees that it does not. Accordingly, they are precluded from seeking judgment as a matter of law based on qualified immunity.[5]

In addition to seeking judgment as a matter of law, however, Verkay and Dorson argue for a new trial under Rule 59 on the ground that the Court did not pose specific interrogatories to the jury. "Waiver under Rule 50 . . . does not imply waiver under Rule 59." *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 538 (S.D.N.Y. 2013) (citing *Bracey v. Board of Educ. of City of Bridgeport*, 368 F.3d 108, 117-19 (2d

---

[4]Dorson, for example, preserved her claim—addressed above—that there was insufficient evidence of her personal involvement in the second arrest.

[5]For the reasons stated *infra* note 6, the Court would deny defendants' request for judgment as a matter of law on qualified immunity even if it had been preserved.

Cir. 2004)).  Therefore, the Court will address the qualified immunity issue in that context.

### 1. Excessive Force (Verkay)

Entitlement to qualified immunity presents a question of law. *See Stephenson v. Doe,* 332 F.3d 68, 80-81 (2d Cir. 2003).  Thus, "[i]f the jury returns a verdict of excessive force . . . , the court should then decide the issue of qualified immunity." *Id.* at 80.

In this case, however, the facts underlying Verkay's use of force were sharply disputed.  The proper course in such a case is for the Court to pose special interrogatories to the jury, and then to make the legal determination based on these facts. *See id.* at 81.  "[I]t is the responsibility of the defendant to request that the jury be asked the pertinent question[s]." *Zellner*, 494 F.3d at 368.

In accordance with *Stephenson*, the Court gave Verkay the opportunity to propose special interrogatories.  In response, he offered the following:

1.  Did officer Verkay believe that plaintiff was a suspect in the stabbing?

2.  Did officer Verkay use force on plaintiff before plaintiff was handcuffed?

Sundaran Decl., Ex. C.  He argues that affirmative responses to both questions would have entitled him to qualified immunity as a matter of law.

The Court did not present Verkay's proposed interrogatories to the jury for two reasons: the answers to his proposed questions were (1) not in dispute and (2) inadequate to give rise to qualified immunity.

As to the first reason, Gad Alla stipulated that the answer to both questions was "yes."  His counsel readily acknowledged that Verkay believed Gad Alla to be Botros's

31

assailant.  Gad Alla's counsel further argued that Verkay had necessarily used some

amount of force before Gad Alla was handcuffed:

> [O]f course they used force on plaintiff before plaintiff was
> handcuffed.  You can't get someone in handcuffs without the
> application of some level of force. . . . So to the extent that
> that's the question they want, we don't disagree that there was
> an application of force before he was handcuffed.

Trial Tr. 1263.

Special interrogatories are vehicles to allow the jury to resolve "key factual

disputes" bearing on the legal determination of qualified immunity. *Cowan ex rel. Estate of

Cooper v. Breen*, 352 F.3d 756, 765 (2d Cir. 2003).  The Court had no duty to present

interrogatories to the jury that were undisputed and could only confuse or mislead the

jury.

The Court also declined to present the proposed interrogatories to the jury

because even affirmative responses would have been insufficient to give rise to qualified

immunity.  Though it was reasonable for Verkay to believe that Gad Alla was a suspect in

the stabbing, that belief on its own did not justify the punch.  At least four officers were

present in the room; Gad Alla was greatly outnumbered.  The officers provided highly

inconsistent and at times incredible testimony about the actions leading up to Verkay's

punch.  Further, there was absolutely no testimony that Gad Alla took any actions that

resembled reaching for a weapon.  Moreover, as noted, by finding that the second arrest

was not supported by probable cause, the jury necessarily credited Gad Alla's testimony

that he was compliant during the first arrest.

Verkay argues that his second proposed interrogatory would have shown

whether the jury believed Verkay's account (that Gad Alla was not yet handcuffed when punched) or Gad Alla's account (that he was already handcuffed when punched).  But, as Gad Alla's counsel pointed out, the poorly phrased question would not actually resolve the issue.  If the jury had answered in the affirmative, the Court would have had to assess qualified immunity guided only by a finding that Verkay had used *some amount* of force before the handcuffing.  Such a finding may well have been based on Verkay's own testimony that he grabbed Gad Alla's arm and pushed him, and would not, therefore, necessarily mean that Verkay *punched* Gad Alla before Gad Alla was handcuffed.  Verkay made no attempt to clarify the proposed interrogatory, perhaps hoping that the ambiguity would strengthen his case.

Since Verkay's proposed interrogatories would not, even if answered in his favor, have supplied a factual predicate for qualified immunity, the Court's decision not to submit them to the jury does not entitle Verkay to a new trial.[6]

## 2. *False Arrest (Verkay and Dorson)*

On Gad Alla's claim for false arrest, Dorson and Verkay would be entitled to qualified immunity if there was "arguable probable cause," which exists if "(a) it was

---

[6]Similarly, even if Verkay had preserved qualified immunity as a ground for judgment as a matter of law, the defects in his proposed interrogatories would preclude that relief.  *See Kerman v. City of New York*, 374 F.3d 93, 119 (2d Cir. 2004) (reversing judgment as a matter of law on qualified immunity where defendant "failed to ask that the jury be given interrogatories that were sufficiently specific to permit it to resolve the factual disputes that were material to his defense"); *Ellis v. La Vecchia*, 567 F. Supp. 2d 601, 609 (S.D.N.Y. 2008) ("[B]ecause Defendant failed to request special interrogatories going to the factual issues relating to Plaintiff's malicious prosecution claim, the record is insufficient to permit the Court to make a finding in Defendant's favor on the qualified immunity issue as a matter of law under Rule 50.").

objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 742 (2d Cir. 2004) (internal quotation marks omitted).

Verkay and Dorson contend that they had no choice but to carry out Ganley's order to arrest Gad Alla. They rely on *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003), which held that "[p]lausible instructions from a superior . . . support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Id.* at 138 (internal quotation marks omitted).

In *Anthony*, however, the supervisor's order "was an apparently valid order in light of the substance of the 911 call and all of the surrounding circumstances known to [the officers]." *Id.* Therefore, the officers "reasonably could have concluded, given [the supervisor's] order, that probable cause existed to seize [the plaintiff]." *Id.* Here, by contrast, Ganley's order was based solely on Verkay's report that Gad Alla was struggling with Anticev and Kalil. It bears repeating that the jury rejected Verkay's account in finding that there was no probable cause to arrest Gad Alla for resisting arrest or obstructing governmental administration.

Officers who knowingly provide false information to serve as the basis for an arrest are not entitled to qualified immunity. *See Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("[I]t would be objectively unreasonable for Almenas to believe he had probable cause to arrest Scotto if Almenas himself fabricated the grounds for arrest."). In other words, Dorson and Verkay cannot claim that Ganley's order was "apparently valid"

34

because they knew, based on events they had personally witnessed, that it was based on false information.[7]

## D.  Damages

Verkay and Dorson object to each element of the jury's damages awards. Because the damages for false arrest deal with a shorter and more discrete period, the Court begins there.

### 1.  False Arrest:  Compensatory Damages

"An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress." *Thomas v. Kelly*, 903 F. Supp. 2d 237, 262 (S.D.N.Y. 2012).  The first category compensates for denial of free movement and harm to dignity. *See Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990).  In reviewing the award, the Court "view[s] the evidence and draw[s] all factual inferences in favor of the [non-movant]," and "accord[s] substantial deference to the jury's determination of factual issues." *Scala v. Moore McCormack Lines, Inc.* 985 F.2d 680, 683 (2d Cir. 1993) (internal quotation marks and citation omitted).

An award is excessive where it "shocks the judicial conscience." *Id.* (internal quotation marks and citation omitted).  A reviewing court must consider awards in

---

[7]Verkay and Dorson argue that the lack of special interrogatories makes it impossible to know whether the jury found that Verkay gave Ganley a false account of the first arrest.  But the only proposed interrogatories submitted to the Court dealt with excessive force.  Dorson and Verkay did not request an interrogatory asking the jury whether the officers believed Gad Alla was resisting.  "Not having made such a request, [they are] not entitled to have the court, in lieu of the jury, make the finding." *Kerman*, 374 F.3d at 120.

comparable cases, "bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Id.* at 684 (internal quotation marks and citation omitted); *see also Disorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Our determination of whether a compensatory damages award is excessive should not be conducted in a vacuum, but instead should include consideration of the amounts awarded in other, comparable cases." (internal quotation marks omitted)).[8]

Looking to comparable cases, the Court finds that the $300,000 award is not excessive. The Second Circuit affirmed a $360,000 compensatory award (roughly $417,000 in 2013 dollars) for a false arrest claim, where the plaintiff was in custody for 19 hours, had not been physically assaulted, but had experienced sleeplessness, anxiety, and suicidal ideation as a result of his arrest. *See Martinez v. Port Auth. of N.Y. & N.J.*, 445 F.3d 158, 160 (2d Cir. 2006).[9] Similarly in *Gardner*, where the plaintiff was falsely arrested and held in custody for approximately 8 hours, the Second Circuit ordered a remittitur award of $50,000 for deprivation of liberty, and $150,000 for past pain and suffering for a jaw injury and emotional distress, representing a combined award of roughly $357,000 in 2013 dollars.

---

[8]Where a jury awards damages for both federal and state claims without distinguishing, the plaintiff is entitled to the benefit of the federal standard. *See Katt v. New York*, 151 F. Supp. 2d 313, 369 n.45 (S.D.N.Y. 2001).

[9]In considering similar cases, the Court uses the Bureau of Labor Statistics's Inflation Calculator to estimate dollar equivalents. *See* CPI Inflation Calculator, *available at* http://data.bls.gov/cgi-bin/cpicalc.pl; *see also Allam v. Meyers*, 906 F. Supp. 2d 274, 289 & n.9 (S.D.N.Y. 2012) (using the CPI Inflation Calculator for this purpose).

*See* 907 F.2d at 1354.[10]

Here, Gad Alla was held for more than 9 hours, during which he experienced physical pain from the injuries sustained in the incident as well as emotional distress from his general terror, humiliation, and fear of being raped.  In arguing that the award is excessive, Dorson and Verkay emphasize the relatively brief period of confinement, but ignore the compelling evidence of physical and mental anguish.  The distress that Gad Alla experienced during his confinement—and continues to experience—support this substantial award.

**2.  *False Arrest: Punitive Damages***

**a.  Vacatur**

Dorson and Verkay argue that Gad Alla did not make a sufficient showing to warrant punitive damages, while Gad Alla asserts that they waived this argument by failing to raise it at the close of his case.  Though Dorson and Verkay insist that they preserved their objection, they clearly have not.  The sole Rule 50(a) motion relating to the false arrest claim was that that Dorson did not personally participate in the arrest.  *See supra* Part II.B.  That is plainly insufficient to challenge entitlement to punitive damages. *See Fabri v. United Techs. Intern., Inc.*, 387 F.3d 109, 125 (2d Cir. 2004) ("At the close of plaintiffs' case, defendants asked for dismissal of all claims but did not argue in the alternative that, even assuming a claim had been made out, plaintiffs had not shown an entitlement to punitive damages. . . . Thus, defendants waived any argument that there was insufficient evidence

--------

[10]In *Gardner*, the pain and suffering award covered false arrest and battery claims.

to support a punitive damages award.").

Even if the Court were to overlook the waiver, the argument would fail on its merits. "Punitive damages are available in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Once again, Verkay and Dorson argue that they were merely following a superior's order. And once again, Gad Alla rightfully points out that they have ignored the evidence that they fabricated their accounts of the first arrest to justify Verkay's use of force. In addition, the jury was entitled to infer from Verkay and Dorson's conflicting and inconsistent testimony that they lied in their reports of the incident.[11] There was, in short, sufficient evidence to warrant punitive damages for false arrest.

**b. Reduction**

---

[11]There is a very real possibility that the jury thought Verkay and Dorson were lying at trial. However, it is not clear that subsequent trial perjury can justify punitive damages. *See Bouman v. Block*, 940 F.2d 1211, 1233 (9th Cir. 1991) ("[I]t has not been decided whether in a proper § 1983 action, perjury could form the basis for assessing punitive damages. . . . We need not reach the question whether a punitive damages award would be justified in an ongoing § 1983 prosecution where the witness has given 'highly suspect' testimony, because the record indicates that there were other . . . reasons which may justify the imposition of punitive damages."); *Luken v. Edwards*, 2012 WL 5332193, at *3 (N.D. Iowa Oct. 26, 2012) ("Luken asked for punitive damages in part based on Edwards's trial testimony that the jury obviously disbelieved. I, too, found her core testimony untruthful and not believable. However, Luken cites no legal authority that false testimony under oath at trial, rather than facts giving rise to a legal cause of action may support punitive damages, and I know of none."). Indeed, to say that a jury could award punitive damages based on trial perjury would be to authorize punitive damages in almost every case in which the jury credits the plaintiff over the defendant.

38

In the alternative, Dorson and Verkay urge the Court to substantially reduce the punitive damages award ($150,000 against each officer, $300,000 in total) as excessive. In *B.M.W. of North America v. Gore*, 517 U.S. 559 (1996), the Supreme Court set forth three guideposts for determining whether a punitive damages award is excessive: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and penalties authorized or imposed in comparable cases. *See id.* at 575.[12]

Reprehensibility calls for consideration of whether Dorson and Verkay: (1) engaged in violent conduct; (2) acted with malice or deceit; and (3) have engaged in repeated acts of misconduct. *See Lee*, 101 F.3d at 809. The first factor is present because, although there was no actual violence involved in the false arrest, the Second Circuit views an officer's act of falsely charging an individual as "an element of real and threatened force." *Lee*, 101 F.3d at 810. The second factor is also present since, as noted, the evidence supports a finding that Dorson and Verkay fabricated their version of events in an attempt to justify Verkay's punch. Although Verkay emphasizes his "kind" acts following the second arrest, the jury could reasonably have viewed them as calculated to reduce the likelihood of a formal complaint. As for the third factor, the parties dispute whether "repeated acts of misconduct" refers only to repeated instances of false arrests. There is no need to resolve this dispute because the presence of violence and deceit is sufficient to

---

[12]Where, as here, punitive damages are based on federal and state violations, the *Gore* test applies because it is more generous than New York's standard. *See DiSorbo*, 343 F.3d at 186.

establish a high degree of reprehensibility. *See Ziemba v. Armstrong*, 433 F. Supp. 2d 248, 255 (D. Conn. 2006) ("The evidence supporting the first two factors, even without the third, is sufficient to establish a high degree of reprehensibility.").

Under the second guidepost in *Gore*, the Court must assess whether the ratio of punitive to compensatory damages is permissible by determining "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred." *Gore*, 517 U.S. at 581 (internal quotation marks and citation omitted). As an initial matter, the Court must decide how to calculate the ratio given that Verkay and Dorson are jointly and severally liable for compensatory damages, but individually liable for punitive damages. In the absence of any guidance from the Second Circuit, the Court follows the Eighth Circuit's approach of "divid[ing] the individual punitive damages awards by the individual *pro rata* shares of the actual damages." *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000).[13] The approach yields a ratio of $150,000 in punitive damages to $150,000 in compensatory damages— 1:1. In a case with substantial compensatory damages, such a ratio is permissible. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417, 425 (2003) ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit.").

Under the third guidepost, the Court compares the punitive damages to

---

[13]Gad Alla proposes dividing each individual punitive damages award by the entire compensatory damages award. The Eighth Circuit rejected that approach, reasoning that it "assumes an impossibility. . . because it posits that each defendant will ultimately pay the full compensatory damages award." *Grabinski*, 203 F.3d at 1026.

criminal and civil penalties available for comparable misconduct to ensure that defendants had fair notice of the penalty to which their conduct exposed them.  *See Gore*, 517 U.S. at 574.  Gad Alla cites the substantial penalties for perjury, but, as noted, the Court doubts that perjury is a relevant consideration.  The conduct that exposed the officers to punitive damages was falsely arresting Gad Alla, not lying under oath.  The Court likewise rejects Gad Alla's proposed comparison to kidnapping because the conduct at issue differs so dramatically from an ordinary kidnapping.

Given the absence of comparable civil and criminal penalties, the Court compares the award to awards upheld in other cases.  In so doing, the Court is mindful that the process is "precarious because the factual differences between cases can make it difficult to draw useful comparisons." *Payne v. Jones*, 711 F.3d 85, 105 (2d Cir. 2013).  Nevertheless, the Court takes general guidance from the Second Circuit's discussion in *Payne* of punitive damages for police misconduct:

> We have described awards ranging from $125,000 to $175,000 as "substantial," *King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993), and we have ordered remittitur of awards as low as $75,000, *see id.* (reducing the award to $50,000); *see also DiSorbo v. Hoy*, 343 F.3d 172, 189 (2d Cir. 2003) (reducing a $1.275 million award to $75,000); *Lee*, 101 F.3d at 813 (reducing a $200,000 award to $75,000); *King*, 993 F.2d at 299 (reducing a $175,000 award to $100,000). Moreover, in police misconduct cases in which we sustained awards around $150,000, *see, e.g., Ismail* [*v. Cohen*, 899 F.2d 183, 185, 187 (2d Cir. 1990)], the wrongs at issue were more egregious . . . .

711 F.3d at 105.  The awards cited are significantly higher when adjusted for inflation.  *See, e.g., Ismail*, 899 F.2d at 187 (roughly $268,000 in 2013 dollars); *Lee*, 101 F.3d at 812-13 (roughly $112,000 in 2013 dollars); *King*, 993 F.2d at 299 (roughly $162,000 in 2013 dollars).

With those figures in mind, the Court concludes that the punitive damages awards of $150,000 are not excessive.

### 3. *Excessive Force: Compensatory Damages*

**a. Economic Damages**

The jury awarded $1,500,000 in economic damages, representing loss of past and potential future earnings, as well as medical expenses.  Verkay contends that this award should be vacated as speculative or reduced as excessive.[14]

Verkay's primary argument is that the economist, Crakes, calculated loss of earning capacity in all three of his scenarios based on the assumption that Gad Alla would never work again.  The Court agrees that this assumption was not supported by the evidence.  No medical expert opined that Gad Alla would never be able to work again.  Even Hibbard, who testified that Gad Alla was "permanently disabled at, fully disabled at the point that I saw him," clarified that he was "[p]otentially" employable and would achieve "some functional improvement with rehabilitation." Trial Tr. 646, 655.  In other words, Hibbard's testimony supports the conclusion that he is able to work, just not as an interpreter.[15] Crakes testified that he would have had to subtract the amount that Gad Alla could still earn from each of his three scenarios, but that he had not done so—and could

---

[14]Gad Alla argues that Verkay has waived this argument.   At the close of Gad Alla's case, defense counsel argued that damages related to the interpreting job in Iraq were speculative.  The Court reassured counsel that it was not necessary to go into each aspect of damages, and that it would caution the jury that damages are not a matter of speculation. *See* Tr. 1069.  Thus, the Court understood defense counsel's objection to apply to damages generally.

[15]The Court rejects Verkay's contention that Gad Alla's testimony and conduct at trial indicate that he can focus well enough to be an interpreter.  He cites nothing to support his view that Gad Alla's ability to answer questions, pay attention, and recall earlier statements means that he can be gainfully employed as an interpreter.

not do so—because he was did not have any information about Gad Alla's residual work ability.

In his closing argument, Gad Alla's counsel disavowed Crakes's assumption that Gad Alla would never be able to work again in any capacity. *See* Trial Tr. 1374 ("But I don't want you to think that we're assuming that he will be disabled for the rest of his life.  We're not.").  He nevertheless invited the jury to use Crakes's calculations as "benchmarks." *Id.*

In other words, Gad Alla asked the jury to reduce Crakes's estimates to account for Gad Alla's residual earning capacity, but did not introduce any evidence on that issue.  Thus, the economic damages award is rooted in speculation and a new trial on that element of damages is warranted. *See Bracey*, 368 F.3d at 119 (ordering new trial because "we cannot, after drawing all reasonable inferences in favor of Bracey, find an evidentiary basis in the record for a jury award [of lost earnings]"); *Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 136-37 (E.D.N.Y. 2010) (ordering new trial because the "amounts of damages in certain categories . . . were unsupported by the record and would require sheer speculation and guesswork by the jury").

When setting aside a damages award, the Court has the discretion to "order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996).  Remittitur is appropriate in two types of cases:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken; and (2) more generally, where the award is

44

> intrinsically excessive in the sense of being greater than the
> amount a reasonable jury could have awarded, although the
> surplus can be ascribed to a particular, quantifiable error.

*Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) (citation and internal

quotation marks omitted).   In either situation, the Court must "confine its role to the

removal of the excess portion of the verdict so that the damage calculation leaves in the

judgment a portion of what the jury awarded." *Id.* (citation and internal quotation marks

omitted).

Although Gad Alla's residual earning capacity was a matter of speculation,

the jury was clearly entitled to conclude that he had lost *some amount* of earnings and future

earning capacity.   Further, the $1.5 million award encompassed both loss of income *and*

medical expenses.   For these reasons, the Court is unable to confine its role to remitting the

excessive portion of the award for future earnings.   Accordingly, the Court finds that a new

trial solely on the issue of economic damages related to the excessive force claim is

necessary. *See Frank Sloup*, 745 F. Supp. 2d at 146-47 ("[S]ince there was no special verdict

form as to damages, it is impossible to discern whether the jury awarded any money in

certain categories of damages and, if so, what the amounts were.").

The speculative nature of Gad Alla's residual earning capacity is sufficient,

standing alone, to require a new trial.   However, the Court briefly addresses Verkay's other

challenges to forestall disputes that may arise during the retrial:

Verkay challenges Crakes's scenarios in three other respects.   He contends

(1) that Crakes's use of median earnings for males with a bachelor's degree bore no relation

to Gad Alla's work history or potential future employment; (2) that his use of the $150,000

salary for the interpreter position in Iraq was unwarranted because the position would have been of limited duration, and because Gad Alla had been disqualified from it due to high cholesterol; and (3) that his use of $34,000 to represent Gad Alla's income in 2008 was based on the erroneous assumption that the amount was for net earnings.

"Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (citation and internal quotation marks omitted). The Court concludes that each of Crakes's scenarios was based on a reasonable assumption of Gad Alla's employment prospects. Any other shortcomings were matters for the jury. *See Sinkov v. Americor, Inc.*, 419 F. App'x 86, 90-91 (2d Cir. 2011) (affirming admission of similar scenarios proposed by Crakes).

The Court likewise rejects Verkay's various challenges to Hibbard's testimony. Her opinion that Gad Alla sustained a TBI was adequately supported by her experience, record review, observations and testing. The jury was entitled to credit that opinion over the contradictory testimony as to whether a zygomatic arch fracture can cause a TBI. The jury was further entitled to credit her assessment of Gad Alla's cognitive functioning. Finally, the jury was entitled to accept her opinion that Gad Alla was not malingering, as well as her explanation of how she came to that conclusion after an initial test showed signs of exaggeration.

Verkay next argues that Simmons-Grab's life-care plan was not restricted to

46

costs causally connected to Verkay's use of excessive force.  The Court disagrees and concludes that there was adequate evidence connecting each of Gad Alla's impairments, including vision and balance problems, to the incident.  Any inconsistencies in her testimony were matters for the jury.

Finally, Verkay notes that Gad Alla's expert witnesses relied, at least to some extent, on Gad Alla's own reports of his symptoms.  He points out many inconsistencies in those self-reports.  These inconsistencies were thoroughly explored at trial, thus enabling the jury to decide whether to credit Gad Alla and the experts who relied on his account.[16]

## b.  Non-Economic Damages

Verkay objects to the jury's award of $250,000 in non-economic damages in one incomprehensible sentence: "The . . . arguments [against the economic damages award] apply as well to the $250,000 non-economic damages for the excessive force claim inasmuch as the non-economic damages arise as a result of plaintiff's injuries."  Defs.' Mem. of Law 19.  By failing to adequately develop this challenge, Verkay has waived it. *See Dean v. Blumenthal*, 577 F.3d 60, 64 n.2 (2d Cir. 2009).

In any event, the jury was instructed that it could award non-economic damages for pain and suffering, emotional distress, and loss of enjoyment of life stemming from the use of excessive force.  It heard ample testimony from Gad Alla, Edward, and several experts.  That testimony described a serious—and permanent—physical injury.

---

[16]Verkay also raises a failure-to-mitigate argument based on Gad Alla's failure to see a physician for medications for his attention difficulty.  Inasmuch as such medication might improve Gad Alla's employment prospects, the Court will address the mitigation issue in the course of the retrial.

The jury's award is well within the acceptable range for such injuries. *See, e.g.*, *Hygh v. Jacobs*, 961 F.3d 359, 366 (2d Cir. 1990) (affirming award of $216,000 ($360,000 in 2013 dollars) for permanent injury to side of face).

### 4. *Excessive Force: Punitive Damages*

#### a. **Vacatur**

As was true of the punitive damages award for false arrest, Verkay waived the argument that the evidence was insufficient to support punitive damages for his use of excessive force. The argument would fare no better on the merits. He argues that he had no evil motive in using force since he reasonably believed that Gad Alla was the assailant and had a knife. The evidence at trial, however, was sufficient to support the inference that Gad Alla posed absolute no threat when Gad Alla punched him.

#### b. **Reduction**

In the alternative, Verkay argues that the $150,000 awarded in punitive damages on the excessive-force claim is excessive. Under the first prong of *Gore*, the jury could easily have found that Verkay engaged in highly reprehensible conduct. The evidence poignantly supports the conclusion that Verkay punched an unarmed, outnumbered and compliant suspect with enough force to break Gad Alla's cheekbone. That unquestionably qualifies as "violent." *Lee*, 101 F.3d at 809. As explained in connection with the false arrest claim, Verkay's subsequent "kind" acts do not prove lack of malice since the jury could reasonably have determined that such acts were taken to discourage Gad Alla from reporting the punch. Malice can also be inferred from Gad Alla's testimony that Verkay said, "That's how we do it," after striking him. Trial Tr. 60. Although the

record does not contain evidence of repeated acts of misconduct by Verkay, the reprehensibility analysis as whole supports a substantial punitive damages award.

With respect to the second prong, the ratio of punitive damages ($150,000) to non-economic compensatory damages ($250,000) is already less than 1:1.  The retrial on economic damages can only lower the ratio.

Under the third prong, the Court compares this award to penalties for similar misconduct.  Gad Alla asserts, without contradiction, that the assault would expose Verkay to up to seven years' imprisonment under state law, *see* N.Y. Penal Law §§ 70.00(2)(d), 120.05(1), or up to ten years' imprisonment and a $250,000 fine under federal law, *see* 18 U.S.C. §§ 242, 3571(b)(3).

Finally, as stated above, the Second Circuit has sustained punitive awards of around $150,000 for egregious police misconduct. *See Payne*, 711 F.3d at 105.  In *Ismail*, for example, the Second Circuit upheld an award of $150,000 (roughly $268,000 in 2013 dollars) for false arrest and excessive force where the officer struck the plaintiff in the head, (causing him to lose consciousness), pressed a gun to his head and threatened to kill him. *See* 899 F.2d at 185.  The incident caused the plaintiff emotional distress, as well as intermittent pain that "interfered to some extent with his daily activities" *Id.* at 186.

Verkay relies heavily on *DiSorbo*, in which the Second Circuit reduced the punitive award to $75,000 (roughly $95,000 in 2013 dollars).  *See* 343 F.3d at 172.  Though the police brutality in that case was similar, it did not result in any lasting injuries.  *See id.* at 179.  The defendant in *Payne*, in which the Second Circuit reduced punitive damages to $100,000, punched the plaintiff several times; however, the circuit court noted that several

49

factors mitigated the reprehensibility of the defendant's conduct, and that the only injuries were aggravations of existing PTSD and back pain.  *See* 711 F.3d at 101-02.

The Court concludes that the circumstances of Verkay's conduct and the significance of the injuries he inflicted make this a case more egregious than either *DiSorbo* or *Payne*, though not as egregious as *Ismail*.  The jury's award of $150,000 reflects a comfortable middle ground between the awards approved in those cases and is, if anything, somewhat conservative.

## III

For the foregoing reasons, Gad Alla's motion is denied; defendants' motions are granted in part and denied in part.  The verdict as to liability stands, and Dorson and Verkay are not entitled to qualified immunity.  The compensatory and punitive damages stand, with the exception of economic damages on the excessive force claim.  That award is vacated, and a new trial is ordered limited to that issue.

**SO ORDERED.**


/s/ Frederic Block
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
October 30, 2013


50